**UTILITY WORKERS UNION
OF AMERICA, LOCAL 246,
AFL–CIO, Petitioner**

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent,**

Southern California Edison
Company, Intervenor.

No. 93–1350.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 19, 1994.

Decided Nov. 18, 1994.

Glenn E. Rothner, Pasadena, CA, argued the cause and filed the briefs for petitioner.

Paul J. Spielberg, Deputy Asst. General Counsel, N.L.R.B., Washington, DC, argued the cause and filed the brief for respondent. With him on the brief were Linda R. Sher, Acting Associate General Counsel, and Aileen A. Armstrong, Deputy Associate General Counsel, N.L.R.B., Washington, DC.

Kenneth E. Johnson, Los Angeles, CA, argued the cause and filed the brief for intervenor Southern California Edison Co. · With him on the brief was Gordon E. Krischer, Los Angeles, CA.

Before: SILBERMAN, GINSBURG, and ROGERS, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

Petitioner, Utility Workers Union of America, Local 246, AFL–CIO, challenges a National Labor Relations Board dismissal of a complaint alleging that Southern California Edison Co. violated § 8(a)(5) of the National Labor Relations Act (NLRA) by unilaterally implementing drug testing procedures for "red badge" employees working in the "Protected Area" of its San Onofre Nuclear Generating Station. In dismissing the charges, the Board deferred to an arbitrator's determination that the parties' collective bargaining agreement authorized the company to implement the testing program. We conclude that the Board's decision to defer to the arbitrator's award was a permissible exercise of its discretion and therefore deny the petition for review.

## I.

The San Onofre Nuclear Generating Station is one of the nation's largest nuclear power plants. In September 1984, the Station's operator, Southern California Edison Co., instituted a drug screening program for its "red badge" employees—those workers whose assignments require unescorted access to the Protected Area of the Station that

comprises the nuclear reactor and related facilities. Under the drug screening program, employees are required to undergo a urinalysis test before being awarded a "red badge" and are subject to annual testing thereafter. Southern California Edison had notified the union of the drug screening program prior to its implementation, but refused to consult with the union despite a request to bargain.

Shortly after learning of the company's determination to institute drug screening, the union filed an unfair labor practice charge with the Regional Director of the Board. The charge alleged that by unilaterally implementing drug tests Southern California Edison had unlawfully refused to bargain in violation of §§ 8(a)(1) and (5) of the Act.[1] Pursuant to the Board's policy of deferring the processing of unfair labor practice claims until the parties have exhausted their contractual arbitration procedures, *see Collyer Insulated Wire,* 192 N.L.R.B. 837 (1971), the Regional Director set aside the unfair labor practice charge pending resolution of the dispute under the contractual grievance-arbitration clause.[2]

In April 1986, the union filed a grievance that eventually proceeded to final and binding arbitration. The question put to the arbitrator was whether Southern California Edison's unilateral implementation of the drug screening program had violated the collective bargaining agreement, which in turn had incorporated the parties' bargaining obligation under the NLRA. After an exhaustive proceeding, the arbitrator determined that Southern California Edison was relieved of any continuing bargaining obligation on that question by virtue of its authority to implement reasonable safety rules under Article X, sections N(1) and (2) of the collective bargaining agreement, which state,

(1) The Company shall make reasonable provisions for the safety of employees in the performance of their work. The Union shall cooperate in promoting the realization of the responsibility of the individual with regard to the prevention of accidents.

(2) The Company reserves the right to draft reasonable safety rules for employees and to insist on observance of such rules. The Union may submit suggestions to the Company's Labor Relations Division concerning plant safety conditions and revision and enforcement of safety rules.

In light of the parties' bargaining history and past practices as well as the particular safety considerations attending the operation of a nuclear power facility, the arbitrator held that the drug screening policy was a reasonable safety rule within the meaning of the contractual language. As such, it was a proper exercise of contractually secured management prerogatives, and therefore did not violate the collective bargaining agreement.

By determining that the company's imposition of the drug screening policy was authorized by the contract, the arbitrator perforce determined that the company had not violated its obligation to bargain over the subject. The statutory and contractual questions were bound together in the single proceeding, and the answer to one was the answer to the other. There could be no unlawful refusal to bargain—under either the collective bargaining agreement or the Act—if the agreement had authorized the company to adopt the testing policy. "No such statutory violation lies," the arbitrator observed, "where contractual language clearly grants to the employer the right, at its sole discretion, to [make and apply safety rules]."

After the arbitrator's decision was finally issued in September 1989, Southern California Edison petitioned the Board's Regional Director to dismiss the unfair labor practice charge that had been held in abeyance. The Regional Director opted to pursue the claim, however, and in May 1992 filed a complaint with the Board alleging that Southern California Edison had violated §§ 8(a)(1) and (5) in implementing the San Onofre drug screening procedures.

---

1. Section 8(a)(5) provides:
   It shall be an unfair labor practice for an employer ... to refuse to bargain collectively with the representatives of his employees....
   29 U.S.C. § 158(a)(5) (1988).

2. The Board's *Collyer* deferral policy was approved by this court in *Hammontree v. NLRB,* 925 F.2d 1486 (D.C.Cir.1991) (en banc).

■ As a concomitant to the Board's *Collyer* deferral policy the Board will, after an arbitrator decides a case, defer to his award if four conditions are satisfied: the arbitrator, in resolving the contractual dispute, must have faced and considered the unfair labor practice issue; the arbitration proceedings must have been fair and regular; the parties must have contractually agreed to be bound by the arbitrator's award; and the arbitrator's award cannot be "clearly repugnant to the purposes and policies of the Act." *Olin Corp.*, 268 N.L.R.B. 573, 573–74, 1984 WL 35996 (1984); *Spielberg Mfg. Co.*, 112 N.L.R.B. 1080 (1955). Although this court has affirmed the Board's application of *Spielberg/Olin* deference to arbitration awards on several occasions, the theoretical underpinnings of the policy have remained somewhat unclear. *See Hammontree*, 925 F.2d 1486, 1504 n. 6 (D.C.Cir.1991) (en banc) (Edwards, J., concurring); *Darr v. NLRB*, 801 F.2d 1404, 1409 (D.C.Cir.1986) (remanding to the Board for further explanation of its deference policy); *see also Plumbers & Pipefitters, Local Union No. 520 v. NLRB*, 955 F.2d 744, 752, 757 (D.C.Cir.) (approving Board deference to pre-arbitration grievance settlement, but urging the Board "to give serious consideration to the logical flaws in its current policy and to attempt to develop a comprehensible theory of deference"), *cert. denied,* — U.S. —, 113 S.Ct. 61, 121 L.Ed.2d 29 (1992).

■ The only real dispute before the Board was whether the arbitrator's award satisfied the last of the *Olin* standards—*i.e.,* whether it was "clearly repugnant" to the Act. *Southern California Edison Co.,* 310 N.L.R.B. No. 211, at 4, 1993 WL 147010 (1993). To establish repugnancy, and thereby avoid dismissal of the complaint, the charging party must show that the arbitrator's decision is "palpably wrong" or "not susceptible to an interpretation consistent with the Act." *Olin Corp.*, 268 N.L.R.B. at 574, 1984 WL 35996. After weighing "all the circumstances," including the arbitrator's findings with respect to contractual language, working conditions, past practice, and the parties' bargaining history, the Board concluded that the arbitrator's award was not "palpably wrong" and so was entitled to deference. *Southern California Edison Co.,*

310 N.L.R.B. No. 211, at 6, 1993 WL 147010. The Board consequently dismissed the complaint. *Id.*

The union then petitioned for review of the Board's decision.

## II.

■ "[T]he Board has considerable discretion to respect an arbitration award and decline to exercise its authority over alleged unfair labor practices if to do so will serve the fundamental aims of the Act." *Carey v. Westinghouse Elec. Corp.,* 375 U.S. 261, 271, 84 S.Ct. 401, 408, 11 L.Ed.2d 320 (1964). We therefore are obliged to proceed cautiously when reviewing a Board determination to defer to an arbitrator's conclusions. The question for us is limited to whether the Board, in deferring to the arbitrator, abused its broad discretion under the Act. *Plumbers & Pipefitters,* 955 F.2d at 750; *Bakery, Confectionery & Tobacco Workers Int'l Union 25 v. NLRB,* 730 F.2d 812, 813 (D.C.Cir. 1984).

■ Petitioner presents several arguments, all of which relate back to one critical contention: that the arbitrator's award was inconsistent with existing Board precedent, and therefore "palpably wrong" as a matter of governing labor law. To defer under such circumstances, petitioner claims, is necessarily an abuse of discretion. If the Board would not, if deciding for itself, reach the same conclusion as did the arbitrator, it cannot accept such an outcome merely because it was first reached in arbitration but must explain why the difference does not amount to a palpable wrong.

Petitioner argues that Board deference is foreclosed in this case by *Johnson–Bateman Co.,* 295 N.L.R.B. 180, 1989 WL 224131 (1989). In that case, the Board ruled that an employer cannot claim that it has satisfied its bargaining obligation with respect to implementing drug testing by pointing to a so-called "zipper clause" in the collective bargaining agreement—a customary contractual provision that secures to management all rights that it would have in the absence of an agreement. This sort of general clause, the Board held, *id.* at 184, 1989 WL 224131,

cannot provide evidence of the "clear and unmistakable waiver" that must be shown before a union will be deemed to have surrendered its statutory bargaining rights for any "terms and conditions of employment." 29 U.S.C. § 158(d). It thus could not excuse an employer's implementation of drug testing in the absence of negotiations. *Johnson–Bateman,* 295 N.L.R.B. at 182–87, 1989 WL 224131.

Petitioner maintains that the safety-rules clause upon which Southern California Edison relies no more establishes a "clear and unmistakable waiver" than did the "zipper clause" at issue in *Johnson–Bateman.* Indeed, the arbitrator did not even purport to apply the "clear and unmistakable waiver" standard in interpreting the scope of the employer's contractual right under the safety-rules provision. As petitioner puts it, the Board actually conceded that the arbitrator's decision was contrary to existing labor law principles in both its analytical method and its conclusion—and yet the Board sanctioned an outcome in this case at odds with its prior decision, which it mentioned only in a footnote. *See Southern California Edison Co.,* 310 N.L.R.B. No. 211, at 6 n. 4, 1993 WL 147010.

We agree with the Board, however, that petitioner's description of its stated reasoning is inaccurate. Although hardly more than a cursory incantation of the arbitrator's conclusions, the Board's opinion below emphatically *did not* decide that the arbitrator's decision was inconsistent with Board precedent. Nor for that matter did the Board determine that it would have come to the same conclusion as did the arbitrator if deciding the case *de novo.* It was enough, the Board held, to determine that the arbitrator had not been "palpably wrong" as a matter of labor law.

As the Board noted (admittedly, in a footnote), *Johnson–Bateman* was distinguishable in several respects. The more general "zipper clause" was less susceptible to an interpretation encompassing drug testing rules than the safety-rules clause at issue here, and the arbitrator had found that the Station was a "safety-critical" environment and that safety concerns had animated the company's drug testing requirement. For these reasons we, like the Board, are satisfied that

*Johnson–Bateman* does not foreordain what decision the Board would have reached in this case *de novo.* We therefore think that the Board reasonably concluded that the arbitrator's conclusions were not "palpably wrong" as a matter of law.

Petitioner also claims that the Board's deference to the arbitrator's award in this case is inconsistent with prior decisions by the Board not to defer. The union points principally to *Bath Iron Works,* 301 N.L.R.B. 898 (1991), in which the Board rejected as "palpably wrong" part of an arbitrator's award regarding an employer's contractual authority to institute a range of drug policies. *See id.* at 902. The Board thought that the agreement's drug-use ban could not be read to authorize rules making possession of "drug paraphernalia" or a drug conviction grounds for discipline. *See id.* On the question most closely analogous to the dispute in this case, however—whether the company was authorized to initiate random drug testing to implement a contractual drug use ban—the Board *did* defer to the arbitrator's award as not "repugnant," notwithstanding that the contractual limitation on drug use did not specify testing. *See id.* at 900. *Bath Iron Works* hardly advances petitioner's cause.

■ Petitioner alternatively argues that the Board's "palpably wrong" standard is illegitimately employed to avoid required decisionmaking. According to petitioner, the Board has no warrant under the statute to defer to an arbitrator's decision that is merely not "palpably wrong." And, petitioner argues, since analytically the Board must first determine whether the arbitrator's decision is wrong before it can conclude that the award is not palpably wrong, the Board may therefore appropriately defer to an arbitrator's decision only if the Board concludes that the arbitrator correctly applied the NLRA. As an appellate court, we have little difficulty in rejecting petitioner's logic. We must consider virtually every day whether a district court's decision as to factual matters is "clearly erroneous," and when we determine that that standard has not been met, we often never decide—even in our own minds— whether the court actually committed error.

---

In other words, petitioner has the analytical process exactly backwards; one can certainly determine that a decision under review is not clearly or palpably wrong without ever determining whether it is simply wrong or erroneous.

Essentially, petitioner's argument is nothing less than a broadside attack on the Board's deference policy itself. Obviously, if the Board must determine whether the arbitrator decided the question exactly as the Board itself would have, it would not be deferring; it would be reviewing the arbitrator's decision—and reviewing it *de novo* at that.

To be sure, this court has, as petitioner reminds us, expressed concern as to the doctrinal basis that underlies the Board's deferral policy as well as its "palpably wrong" limitation. *See Darr v. NLRB*, 801 F.2d 1404, 1409 (D.C.Cir.1986); *Plumbers & Pipefitters Local Union No. 520 v. NLRB*, 955 F.2d 744, 757 (D.C.Cir.), *cert. denied*, ⎯ U.S. ⎯, 113 S.Ct. 61, 121 L.Ed.2d 29 (1992). In *Darr*, we remanded to the Board to explain under which of several possible theories it might permissibly defer to an arbitrator's award inconsistent with Board precedent. The Board has yet to respond.[3] Petitioner argues that at minimum we should, by remanding again, compel the Board to answer the questions we posed in *Darr*. We think, however, that *Darr* is distinguishable. There, an arbitrator found that an employee had been discharged discriminatorily, in likely violation of § 8(a)(3), and yet in awarding reinstatement refused—contrary to explicit Board policy—to order back pay as well. *Darr*, 801 F.2d at 1406. Moreover, the arbitrator's conclusion that the employer's action violated the Act did not in any way depend on an interpretation of the collective bargaining agreement—indeed, it is unclear whether an employee's statutory protection against discriminatory treatment in retaliation for exercising his or her § 7 rights can even be "waived" in collective bargaining. *See id.* at 1408; *see also Metropolitan Edison Co. v. NLRB*, 460 U.S. 693, 705–07, 103 S.Ct. 1467, 1475–76, 75 L.Ed.2d 387 (1983). Under those circumstances, we

could not understand how the Board could ignore its uniform remedial precedent and instead defer to the arbitrator's contrary award.

■ In the case at bar, by contrast, whether or not the employer violated § 8(a)(5) of the Act (the obligation to bargain in good faith) depends entirely on what the collective bargaining agreement means. As we have noted, "[t]o the extent that a bargain resolves any issue, it removes that issue *pro tanto* from the range of bargaining." *United Mine Workers 1974 Pension v. Pittston Co.*, 984 F.2d 469, 479 (D.C.Cir.) (quoting *Connors v. Link Coal Co.*, 970 F.2d 902, 905 (D.C.Cir.1992)), *cert. denied*, ⎯ U.S. ⎯, 113 S.Ct. 3040, 125 L.Ed.2d 726 (1993). For this reason, we have expressed doubt as to whether the Board's requirement of a "clear and unmistakable waiver" is even appropriate when interpreting a collective bargaining contract. "[Q]uestions of 'waiver' normally do not come into play with respect to subjects already covered by a collective bargaining agreement." *NLRB v. United States Postal Serv.*, 8 F.3d 832, 836–37 (D.C.Cir. 1993). And, consistent with this reasoning, we have concluded that when a refusal to bargain claim is answered with a defense of contractual right, the unfair labor practice and the contractual dispute converge. *See IRS v. FLRA*, 963 F.2d 429, 440 (D.C.Cir. 1992) ("In the refusal to bargain context, . . . the resolution of the unfair labor practice claim is *entirely* a matter of contract interpretation, because whether there is a duty to bargain depends solely upon what the contract means."); *cf. American Freight Sys., Inc. v. NLRB*, 722 F.2d 828, 832 (D.C.Cir. 1983) (where dispute concerns contractual waiver of § 8(a)(1) statutory rights, the "contention that there is a statutory issue apart from the contractual issue" is an "obvious fallacy.").

■ In that same vein, although the Board certainly has authority to interpret collective bargaining agreements in the course of determining whether a party has committed an unfair labor practice, *NLRB v.*

---

3. On remand the Board determined not to defer to the arbitrator's award after all, and so avoided answering the questions we put to it. *See Cone*

*Mills Corp.*, 298 N.L.R.B. 661, 1990 WL 122511 (1990).

*C & C Plywood Corp.*, 385 U.S. 421, 429, 87 S.Ct. 559, 564, 17 L.Ed.2d 486 (1967); *Carey v. Westinghouse Elec. Corp.*, 375 U.S. 261, 272, 84 S.Ct. 401, 409, 11 L.Ed.2d 320 (1964), it is by no means apparent that the Board is thereby entitled to disregard an arbitrator's interpretation of a contract as "palpably wrong." After all, a federal district court presiding over a § 301 proceeding seeking enforcement of an arbitrator's award must give the award the greatest deference imaginable—the award must be enforced so long as the arbitrator purports to be interpreting the contract rather than dispensing "his own brand of industrial justice." *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960). And as the Supreme Court has recognized (relying on an opinion of our court, *Local Union 1395, Int'l Bhd. Elec. Workers v. NLRB*, 797 F.2d 1027, 1032 (D.C.Cir.1986)), the federal judiciary owes no deference to the Board's interpretation of collective bargaining agreements, because parties can seek enforcement of arbitration awards in the federal courts directly. *Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 203, 111 S.Ct. 2215, 2223, 115 L.Ed.2d 177 (1991). "We would risk the development of conflicting principles were we to defer to the Board in its interpretation of the contract, as distinct from its devising a remedy for the unfair labor practice that follows from a breach of contract." *Id. But cf. NLRB v. Acme Indus. Co.*, 385 U.S. 432, 437, 87 S.Ct. 565, 568, 17 L.Ed.2d 495 (1967) (dicta) (because § 10(a) of the NLRB provides that the Board's power to prevent unfair labor practices "shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, law, or otherwise," 29 U.S.C. § 160(a) (1988), the Board may not be obliged "to defer to the primary determination of an arbitrator"). That proposition of law suggests that if the Board were to decide against deferring to an arbitrator's award on the ground that it was "palpably wrong" when a federal court would have been obliged to enforce the award under *Enterprise Wheel & Car*, 363 U.S. at 596–97, 80 S.Ct. at 1360–61, the Board's order would be unenforceable in the courts of appeals; otherwise, both an arbitrator's award and a conflicting Board order could be enforced simultaneously in the federal courts.

■ Be that as it may, whether or not the Board could *refuse* in a § 8(a)(5) case to defer to an arbitrator's award under its palpably wrong standard, it seems rather clear to us that the Board *can* do the opposite— defer to an arbitrator's award that is not palpably wrong. Petitioner is, in a sense, correct in its claim that the Board's "palpably wrong" standard is a vehicle for the avoidance of decisionmaking. It is precisely that: the Board's deference policy is motivated by an effort to conserve the Board's resources and, where possible, to abide by the resolutions arrived at by the private mechanisms that are the primary and preferred adjudicators of contractual labor disputes. Arbitration is preferred for the simple reason that it is understood to be "a part of the continuous collective bargaining process" that lies at the heart of the NLRB. *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 581, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409 (1960). Having found that the award was not "palpably wrong" as a matter of national labor policy, the Board was fully justified in deferring to the arbitration proceedings. The petition for review is therefore denied.[4]

*So ordered.*

---

4. Petitioner also argues that review should be granted because the Board failed to consider its contention that the award proceedings were not "fair and regular," and thus not entitled to deference under *Olin*. Petitioner's theory of irregularity and unfairness is based simply on its contention that the arbitrator refused to accept submissions after the close of the arbitration proceedings and thus did not consider important developments—namely, the Board's intervening decision in *Johnson–Bateman*. In other words, petitioner's unfairness claim merges with its argument that the award was inappropriate as a matter of law. We think the Board adequately addressed the fairness concern when it determined that the arbitrator's award was not "clearly repugnant" to *Johnson–Bateman*.