United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued May 4, 1998 Decided June 12, 1998

 No. 97-1638

 Burns International Security Services, 

 Petitioner 

 v.

 National Labor Relations Board, 

 Respondent 

 On Petition for Review and Cross-Application 

 for Enforcement of an Order of the 

 National Labor Relations Board

 Thomas J. Piskorski argued the cause and filed the briefs 
for petitioner.

 Robert J. Englehart, Attorney, National Labor Relations 
Board, argued the cause for respondent, with whom Linda 
Sher, Associate General Counsel, Aileen A. Armstrong, Depu-
ty Associate General Counsel, and Frederick C. Havard, 


Supervisory Attorney, were on the brief. Frederick L. Corn-
nell, Jr., Attorney, entered an appearance.

 Before: Edwards, Chief Judge, Silberman and Sentelle, 
Circuit Judges.

 Opinion for the Court filed by Chief Judge Edwards.

 Edwards, Chief Judge: This case presents the narrow 
question whether, under established case law, the National 
Labor Relations Board ("NLRB" or "Board"), may decide a 
refusal to bargain unfair labor practice claim, arising under 
sections 8(a)(5) and 8(a)(1) of the National Labor Relations 
Act ("NLRA" or "Act"), 29 U.S.C. ss 158(a)(5), (1), where an 
employer acts pursuant to a viable claim of right under a 
collective bargaining agreement ("CBA"), the matter in dis-
pute is covered by the arbitration clause in the CBA, and the 
employer unconditionally seeks submission of the dispute to 
arbitration. On the facts at hand, the Board should have 
deferred to arbitration. Because the Board gave no good 
reason for failing to follow well-established case law, we grant 
the employer's petition for review.

 I. Background

 During the time period relevant to this appeal, Burns 
International Security Services ("Burns" or "employer") pro-
vided security guard services at a nuclear power plant owned 
by Yankee Atomic Electric Services in Rowe, Massachusetts 
("Yankee Rowe"). Approximately 20 Burns employees at 
Yankee Rowe were represented by a union affiliated with 
United Government Security Officers of America ("Union"). 
Burns and the Union had a CBA that ran from January 23, 
1991, to December 10, 1993.

 Under the "Holidays" clause (article XV) of the CBA, the 
parties had agreed that holiday pay would be paid to "regular 
full-time employees" who completed the last regularly sched-
uled work day before a given holiday and the first regularly 
scheduled work day after such holiday.1 For a number of 

__________
 1 The Holidays clause states, in pertinent part:


years, however, Burns had granted holiday pay to employees 
who were out on workers' compensation leave, i.e., notwith-
standing the fact that such employees had not actually 
worked the days immediately preceding and immediately 
following the holiday. In late 1993, Burns discovered that it 
was not required by state law to give holiday pay to employ-
ees on workers' compensation. Subsequently, Burns refused 
to pay three unit employees, who were then receiving work-
ers' compensation, for the 1993 Thanksgiving holiday. On 
December 23, 1993, Burns sent a letter, dated December 10, 
1993, to the affected employees, notifying them of the change 
in policy. In early January 1994, the Union's president 
learned about this change when one of the three affected 
employees showed him a copy of Burns' letter. Neither the 
Union nor any of the affected employees sought to grieve the 
issue under the CBA.

 Meanwhile, in late 1993 and during the first few months of 
1994, Burns and the Union attempted to negotiate a new 
contract to replace the CBA which had expired on December 
10, 1993. These negotiating efforts faltered, however, and, on 
March 9, 1994, the Union called a strike. The striking 
employees had marked their pro-strike ballots to show that 
they based their votes, at least in part, on alleged unfair labor 
practices committed by Burns, including "unilateral changes." 
J.A. 13. On March 30, 1994, the Union voted to end the 
strike, and, on April 1, 1994, Burns received unconditional 
offers to return to work from all the striking employees. 
Burns did not immediately reinstate the employees, however, 
because by then the company had hired replacements.

__________
 A regular full-time employee who has successfully completed 
 his six (6) month probationary period [is entitled to holiday 
 pay].

 ....

 In order to receive [holiday pay], the employee must fully 
 complete his last regularly scheduled work day before the 
 holiday itself and first regularly scheduled work day after the 
 aforesaid holidays [sic].

Joint Appendix ("J.A.") 690-91.


 On April 21, 1994, the Union filed a charge with the NLRB, 
and a complaint issued, alleging that Burns committed unfair 
labor practices by changing the practice covering holiday pay 
for employees on workers' compensation and by refusing to 
reinstate the strikers. In a decision issued on September 30, 
1996, an administrative law judge ("ALJ") found that Burns 
had failed "to bargain collectively" with the Union pursuant to 
sections 8(a)(5) and 8(d) of the NLRA, 29 U.S.C. ss 158(a)(5), 
(d), and thereby committed an unfair labor practice under 
sections 8(a)(5) and 8(a)(1) of the Act, by unilaterally discon-
tinuing the holiday pay. The ALJ also found that Burns' 
discontinuance of holiday pay was a "contributing" cause of 
the strike and, therefore, Burns violated sections 8(a)(3) and 
8(a)(1) of the Act, 29 U.S.C. ss 158(a)(3), (1), by refusing to 
reinstate the strikers immediately upon their unconditional 
offer to return to work on April 1, 1994. See J.A. 14.

 The ALJ rejected Burns' arguments that the CBA autho-
rized the company's holiday pay action. The judge also 
dismissed the contention that the Union had waived its right 
to bargain over holiday pay for employees on workers' com-
pensation through a "Waiver" clause (article XXVII), also 
known as a "zipper" clause, contained in the CBA.2

__________
 2 The Waiver or zipper clause states:

 The parties acknowledge that during the negotiations which 
 resulted in this Agreement, each had the unlimited right and 
 opportunity to make demands and proposals with respect to 
 any subject or matter not removed by law from the area of 
 collective bargaining, and that the understanding and Agree-
 ments arrived at by the parties after the exercise of that right 
 and opportunity are set forth in this Agreement. Therefore, 
 the Employer and the Union, for the life of this Agreement, 
 each voluntarily and unqualifiedly waives the right and each 
 agrees that the other shall not be obligated to bargain collec-
 tively with respect to any subject or matter not specifically 
 referred to or covered in this Agreement, even though such 
 subjects or matters may not have been within the knowledge or 
 contemplation of either or both of the parties at the time they 
 negotiated or signed this Agreement.

J.A. 9; J.A. 701-02.


 Finally, the ALJ rejected Burns' contention that the issue 
of holiday pay was subject to arbitration. The judge first 
questioned whether the holiday pay dispute "was even arbi-
trable," on the assumption that holiday pay for employees on 
workers' compensation was an extra-contractual benefit. J.A. 
15. Without resolving this point, the ALJ held that the 
dispute need not be submitted to arbitration, because Burns 
had notified the Union by letter dated December 27, 1993, 
that it did not consider itself subject to binding arbitration 
without a new collective bargaining agreement. See J.A. 15-
16.

 The Board adopted the analysis and recommendations of 
the ALJ with minor modifications. See Burns Int'l Security 
Servs., 324 NLRB No. 89 (Sept. 29, 1997) ("Order"), reprinted 
in J.A. 7-17. Although Burns again claimed that the dispute 
should be submitted to arbitration, the Board did not specifi-
cally address the arbitration argument. The Board ordered 
Burns to make whole all employees who were wrongly denied 
holiday pay and to reinstate all striking employees who had 
not yet been returned to their jobs. This petition for review 
and cross-application for enforcement of the Board's order 
followed.

 II. Discussion

 It is well settled that when an employer defends against a 
refusal to bargain charge by contending that its actions were 
authorized by the collective bargaining agreement, the refusal 
to bargain charge presents an issue of contract interpretation. 
See, e.g., Utility Workers Union v. NLRB, 39 F.3d 1210, 1215 
(D.C. Cir. 1994). In Collyer Insulated Wire, 192 N.L.R.B. 
837 (1971), the Board established the general rule, repeatedly 
affirmed by this court, that it will refrain from initiating an 
unfair labor practice proceeding if the collective bargaining 
agreement provides for arbitration as the method of resolving 
disputes over the meaning of the agreement. See McDonnell 
Douglas Corp. v. NLRB, 59 F.3d 230, 233-34 (D.C. Cir. 1995); 
NLRB v. United States Postal Service, 8 F.3d 832, 837 (D.C. 
Cir. 1993); Hammontree v. NLRB, 925 F.2d 1486, 1490-91 
(D.C. Cir. 1991) (en banc).


 Under Collyer and its progeny, there is little doubt that the 
Board should have deferred the dispute over the holiday pay 
action to arbitration. Burns contends that two provisions of 
the CBA read together authorized its decision to eliminate 
holiday pay for employees on workers' compensation. Burns 
points, first, to the Holidays clause, which explicitly provides 
that holiday pay will be given only to "regular employees" 
who meet certain other requirements with respect to the 
particular holiday for which pay is sought. Burns also relies 
on the Management Rights clause (article II), which provides, 
in pertinent part:

 This Agreement shall not be construed to infringe or 
 impair any of the normal management rights of the 
 Employer which are not inconsistent with the provisions 
 of this Agreement. Included among management rights 
 ... is the right to change existing business practices.... 
 The right of the Employer to make rules and regulations 
 not in conflict with this Agreement as it may from time 
 to time, deem best for the purpose of maintaining order, 
 safety and/or effective operations, and after advance 
 notice thereof to the Union and to the employees, to 
 require compliance therewith by employees is recog-
 nized.

J.A. 9-10 n.3; J.A. 665-66. An arbitrator plausibly might 
conclude from these provisions that Burns, upon discovering 
in late 1993 that state law did not require it to pay employees 
on workers' compensation for holidays, was authorized by the 
CBA to cease making those payments. The Union, in turn, 
could claim that the Holidays clause was not inconsistent with 
the employer's holiday pay practices and so the employer 
should be bound to continue established past practices. In 
short, the claim that Burns had no right to eliminate holiday 
pay for certain employees undoubtedly presents a dispute 
over the proper interpretation of the CBA.

 Burns also argues that the holiday pay issue is one that the 
company and the Union agreed to make subject to grievance 
and arbitration procedures under the terms of the CBA. See 
Br. of Petitioner at 7. Article VII of the CBA, entitled 


"Grievance and Arbitration Procedure," sets forth a multi-
step procedure for resolving a dispute between the employer 
and an employee or the Union regarding "the meaning or 
application of" the CBA. J.A. 670. The final step of the 
procedure is arbitration, with the arbitrator's award being 
"final and binding." J.A. 674. The Board does not dispute, 
and we agree, that a disagreement over the meaning of the 
Holidays and Management Rights clauses is subject to arbi-
tration under the CBA. See AT&T Technologies v. Commu-
nications Workers, 475 U.S. 643, 650 (1986) (arbitration 
clause in collective bargaining agreement gives rise to "pre-
sumption of arbitrability") (citing Steelworkers v. Warrior & 
Gulf Co., 363 U.S. 564, 582-83 (1960)); Collyer, 192 N.L.R.B. 
at 842.

 Finally, it is clear that Burns raised the issue of arbitration 
before the Board. In its amended answer to the General 
Counsel's complaint, Burns stated as an alternative defense 
that: "In the case of the unfair labor practices alleged 
[arising out of the discontinuance of holiday pay], the Union 
failed to pursue a grievance. The employer remains willing 
to waive any procedural barriers to arbitration of said 
dispute, and the matter should be deferred to arbitration." 
Amended Answer to Complaint (Sept. 8, 1995), reprinted in 
J.A. 597 (emphasis added). Thus, this case is unlike Postal 
Service, in which the employer never claimed that the Board 
should have deferred to arbitration. See Postal Service, 8 
F.3d at 837. In those circumstances, we held that the Board 
had authority to interpret the relevant contract for purposes 
of deciding the unfair labor practice charge. See id. Here, 
by contrast, Burns argued to the ALJ, to the Board, and to 
this court, that the Board should defer, because the holiday 
pay issue raised an arbitrable dispute. Given the contractual 
nature of the holiday pay dispute and Burns' unambiguous 
and unconditional request for arbitration, we agree that the 
Board should have deferred.

 The Board, in rejecting Burns' defenses, appeared to adopt 
the theory that the issue of holiday pay for employees on 
workers' compensation was not "contained in" the CBA within 
the meaning of section 8(d) of the Act, 29 U.S.C. s 158(d). 


The Board thought that, because Burns had developed a 
"past practice" of granting holiday pay that was arguably 
separate from the explicit terms of the CBA, the company 
could not change the existing holiday pay arrangement with-
out agreement from the Union. In other words, the Board 
thought that holiday pay for employees on workers' compen-
sation was outside the scope of the CBA, so there was no 
contractual term that required interpretation in arbitration.

 We reject the Board's theory. We first note, however, that 
in argument before this court, Board counsel confused the 
issue by suggesting that the disputed holiday pay practice 
was an "implied term" of the CBA. If, as Board counsel 
suggested, the holiday pay practice was an implied term, then 
undoubtedly it was "contained in" the CBA and the dispute 
over its meaning should have been submitted to arbitration. 
See generally Consolidated Rail Corp. v. Railway Labor 
Executives' Ass'n, 491 U.S. 299, 311 (1989) ("[C]ollective 
bargaining agreements may include implied as well as ex-
press terms."); Bonnell/Tredegar Indus., Inc. v. NLRB, 46 
F.3d 339, 344 (4th Cir. 1995) ("An employer's established past 
practice can become an implied term of a collective bargain-
ing agreement.") (citing cases); Elkouri & Elkouri, How 
Arbitration Works 632 (5th Ed. 1997) (surveying circum-
stances in which arbitrators give employer custom " 'binding 
practice' effect as an implied term of the agreement").

 In any event, the Board's analysis, predicated on the 
assumption that the discontinued holiday pay was extra-
contractual, is patently flawed. The relevant inquiry in this 
case is whether Burns acted on a viable claim of right under 
the parties' CBA in eliminating the holiday pay practice. So 
long as the employer plausibly claims contractual justification 
for its actions under the express or implied terms of the CBA, 
and the matter in dispute is subject to arbitration, then the 
Board should leave the parties to their contract remedies 
unless the employer refuses to go to arbitration. See Harry 
T. Edwards, Deferral to Arbitration and Waiver of the Duty 
to Bargain; A Possible Way Out of Everlasting Confusion at 
the NLRB, 46 Ohio St. L.J. 23, 32-35 (1985). This is not a 
case in which the employer, relying solely on a zipper clause 


that did no more than waive the duty to bargain, sought to 
take unilateral action with respect to a mandatory subject of 
bargaining not contained in the CBA. See United Auto 
Workers v. NLRB, 765 F.2d 175, 183 (D.C. Cir. 1985) ("Al-
though a zipper clause may waive the obligation to bargain 
over all mandatory subjects during the term of an agreement, 
it surely does not waive the union's right to object to an 
employer's taking unilateral action with respect to such sub-
jects."). Here, the employer plausibly relied on the Holidays 
and Management Rights provisions in claiming an issue prop-
er for arbitration.

 The Board also thought it could resolve the failure-to-
bargain claim because of Burns' letter to the Union, dated 
December 27, 1993, which stated, "absent a new agreement, 
Burns is not bound by and would not recognize binding 
arbitration for any disputes which may arise in the grievance 
procedure." Letter from Guy R. Thomas, Labor Relations 
Manager, Burns International Security Services, to James A. 
Vissar, President, International Union, United Government 
Security Officers of America (Dec. 27, 1993), J.A. 715; see 
Order, J.A. 15-16. The Board's position on this point is 
meritless. It is undisputed that Burns implemented its new 
holiday pay policy in November 1993, before the CBA expired. 
Thus, Burns' letter, written after expiration of the CBA, does 
not support the Board's conclusion that Burns had "disa-
vowed its obligation to process" a grievance based on the 
holiday pay dispute pursuant to article VII of the CBA. 
Order, at J.A. 16. The letter only served to notify the Union 
that Burns would not recognize arbitration for issues arising 
after the expiration of the CBA, as long as there was no 
replacement CBA. Indeed, as the ALJ and Board found, the 
Union officials themselves informed the membership at the 
strike-vote meeting on March 9, 1994, that Burns "had noti-
fied the Union in December that it would not arbitrate any 
grievances that arose after the contract expired." Id. at J.A. 
13 (emphasis added).

 In short, there is nothing in the record to suggest, nor did 
the ALJ or the Board ever claim, that Burns ever refused to 
arbitrate an issue that arose during the course of the CBA. 


Indeed, had the Union sought to grieve the holiday pay action 
pursuant to the expired CBA, it is doubtful Burns would have 
had a plausible legal basis to refuse such a request. See 
Litton Financial Printing Div. v. NLRB, 501 U.S. 190, 205-
06 (1991) ("A postexpiration grievance can be said to arise 
under the contract ... where it involves facts and occur-
rences that arose before expiration...."). Goya Foods, Inc., 
238 N.L.R.B. 1465 (1978), says nothing to the contrary (as the 
ALJ seemed to think), nor does it support the Board's 
suggestion that ongoing arbitration proceedings are a prereq-
uisite to the enforcement of a CBA's arbitration clause.

 Under Collyer and its progeny, the Board was required to 
defer to arbitration, plain and simple. The Board has not 
pointed to any factual circumstances which, under established 
case law, would weigh against a decision to defer to arbitra-
tion. See Hammontree, 925 F.2d at 1490 (suggesting condi-
tions where deferral to arbitration may be inappropriate) 
(citing Collyer, 192 N.L.R.B. at 842). Indeed, arbitration is 
ideally suited to resolving the type of contractual dispute 
decided by the Board in this case.

 Because the Board erred in resolving the failure-to-bargain 
charge, there is no basis for the Board's conclusions that the 
strike by employees at Yankee Rowe was an unfair labor 
practice strike, and that Burns violated sections 8(a)(3) and 
8(a)(1) by failing to immediately reinstate the strikers upon 
their unconditional offer to return to work. Thus, we need 
not address the question whether substantial evidence sup-
ports the Board's finding that the holiday pay dispute was a 
contributing cause of the strike.

 III. Conclusion

 For the foregoing reasons, we grant Burns' petition for 
review and deny the Board's cross-application for enforce-
ment.